

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00199-CV

IN THE INTEREST OF W.C.B., A
CHILD

----------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from a trial court's judgment after a bench trial on competing motions to modify in which the trial court named both parents joint managing conservators and designated the child's father as the parent with the exclusive right to establish the primary residence of the child. In two issues, appellant, the child's mother, contends (1) that the trial court abused its discretion by admitting an expert's testimony in violation of rule 194.2(f) of the rules of civil procedure and (2) that the trial court's finding that it was in the child's best

---

[1]*See* Tex. R. App. P. 47.4.

interest for the father to be the parent with the exclusive right to establish the primary residence of the child is against the great weight and preponderance of the evidence. We affirm.

## Background

The parties' March 2010 agreed divorce decree named them joint managing conservators of W.C.B. with neither having the exclusive right to designate the child's primary residence. At the time, both parents lived in Wichita Falls, and they alternated weekly possession of W.C.B. Mother subsequently remarried and moved with her new husband to Colorado Springs, Colorado. She then filed a motion to modify the decree to clarify that she had the exclusive right to designate the child's residence without regard to geographic location, and Father filed a countermotion seeking to be named the parent with the exclusive right to designate the child's primary residence within Wichita or contiguous counties. The trial court rendered temporary orders providing for alternating approximately thirty-day possession periods. After a bench trial, the trial court granted Father's motion and denied Mother's.

## Rule 194.2(f)

Father's first witness was a licensed professional counselor who had been counseling Father since a couple of months after Father filed for divorce. While cross-examining the counselor, Mother's counsel learned that he had kept notes of his sessions with Father. Mother's counsel objected that Father's counsel had not filed a written report of the expert's observations, conclusions, and basis for

2

his opinions in response to a rule 194.2 discovery request and contended that he should not be allowed to testify. Upon more extensive questioning, the counselor testified that although he reviewed the session notes briefly before each session with Father, he did not review the notes before testifying in anticipation of doing so, nor did he create them for the purpose of testifying. Thus, the trial court overruled Mother's objection.

> Texas Rule of Civil Procedure 194.2(f)(4)(A) states
>
> A party may request disclosure of any or all of the following: . . . (f) for any testifying expert: . . . (4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party: (A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert *in anticipation of the expert's testimony* . . . .

Tex. R. Civ. P. 194.2(f)(4)(A) (emphasis added).

We conclude and hold that the trial court did not abuse its discretion by overruling Mother's objection to the counselor's testimony. We overrule Mother's first issue.

### Best Interest

In her second issue, Mother contends that the trial court's finding that it is in the child's best interest for Father to be named the parent with the exclusive right to determine the child's primary residence is against the great weight and preponderance of the evidence.

**Standard of Review**

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

**Material and Substantial Change**

Mother first claims that the trial court should not have concluded that her relocating to Colorado Springs was a material and substantial change in circumstances because the parties had contemplated during the divorce that Mother, a member of the military, would be reassigned. During the marriage, Mother had applied to be reassigned to San Antonio. According to Mother, the

decree contemplated such a relocation because it had a provision that if the parties moved more than 100 miles apart, the weekly exchanges would occur at a midway point. Citing *Watts v. Watts*, 563 S.W.2d 314 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e), *disapproved of on other grounds by Jones v. Cable*, 626 S.W.2d 734 (Tex. 1981), Mother contends that for the trial court to rely on the move to Colorado as a material and substantial change in circumstances, it would need to find that such a move could not have been contemplated at the time of the decree.

The trial court found that because Mother had moved hundreds of miles away from Wichita County, the "prior agreed orders regarding conservatorship, access and the 'week-to-week' visitation schedule, are presently unworkable." Mother admitted in her own pleadings that the parties' circumstances had materially and substantially changed; thus, she judicially admitted that fact. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001); *Simmons v. Elmow Holdings, Inc*., No. 02-08-00027-CV, 2008 WL 2716805, at *4 (Tex. App.—Fort Worth July 10, 2008, pet. denied) (mem. op.). Therefore, we hold that the trial court's finding of a material and substantial change in circumstances is not against the great weight and preponderance of the evidence.

**Evidence Relevant to Best Interest Finding**

Mother also challenges the trial court's findings concerning her remarriage: that her relationship with her new husband began before the divorce from Father

5

was final, that Mother moved in with her new husband and his children less than two weeks after the divorce was final, and that the marriage to her new husband occurred after no engagement period. Mother argues that although these findings are technically correct, they are not enough to support a conclusion that it is in the child's best interest that Father be the parent with the exclusive right to determine the primary residence of the child. According to Mother, this scenario, too, was anticipated at the time of the divorce, and Father should have challenged it before the final decree was rendered or in a motion for new trial.

Mother also points to evidence that Father had a drinking problem while married to Mother, that he had drunk alcohol around the child in the past, and that he had started to drink beer again with his friend. Mother tries to link this evidence to evidence that Father drove the child around his driveway on a motorcycle without a helmet, allowed the child to ride a horse without a helmet and sometimes alone without an adult holding the reins, and allowed the child to ride a four-wheeler with him without the child's wearing a helmet to show that he is not concerned about the child's safety. Mother also points to evidence that Father dips snuff and will let the child decide whether he wants to do so as well when he turns eighteen. Because Mother's challenge is to the great weight and preponderance of the evidence, we have reviewed the entire record.

**Mother's Evidence**

According to Mother, at the time of the March 2010 divorce, she had applied for a military position in San Antonio but was not scheduled to leave until

6

May 2011; she told Father she was going to Colorado instead in July 2010. W.C.B. attended daycare in Wichita Falls; he stayed at an in-home daycare in Colorado during the thirty-day possession periods set forth in the temporary orders. According to Mother, W.C.B. would attend pre-K in Colorado in a very good school district. Mother testified that her mother lives in Bowie, Texas, and her father lives in Henrietta, Texas. She also has family in Wichita Falls, Decatur, and Nocona. She testified that Father did not like her mother and had threatened to divorce her if she maintained a relationship with her mother; she also said her mother did not like Father and thought he would not be good for her.

Mother testified that when she told Father about moving to Colorado, he did not let her speak to W.C.B. for a two-week period, and Father did not respond to any type of communication from her. She went to Father's house during his period of possession, but he would not open the door; he finally let her see W.C.B., but he would not let W.C.B., who had a towel over his head, face her. According to Mother, Father told her he was doing it because he could. Mother testified to two instances in which she asked for limited possession of W.C.B. during Father's period of possession, and he would not allow it. She also testified that she gave Father additional possession during her period, but he would not let her make it up.

According to Mother, W.C.B. would have more stability with her because she had a supportive spouse and two stepchildren who got along well with

7

W.C.B., she and her husband are safety conscious, and she is very goal driven with respect to education. She believed Father was not as well suited to determine W.C.B.'s primary residence because he is young, a single father, a mechanic with no certifications or desire to further his education, an insufficient disciplinarian, and not conscious enough for W.C.B.'s safety. She also said that "[h]is alcohol has always been a problem."

Mother admitted that she could be deployed anytime. Mother's new husband had never formally met Father. He admitted drinking alcohol in front of W.C.B. and his own children but never to excess. He also testified that he did not believe Father was as suited to be a father as he is.

Mother testified that her first, brief marriage was to an abusive husband; she had contacted Father before the dissolution of that marriage but after she knew she wanted a divorce. She had been engaged to Father before marrying her first husband, but she broke off the engagement. Mother started seeing her current husband before her divorce from Father was final; she moved in with him about two weeks after the divorce became final, and she married him just over two months later.

A neighbor who lived down the street and spent time with the family during the marriage (and who also admitted that she was closer to Mother than Father) testified that she had seen Father but not Mother intoxicated at her house before. She thought W.C.B. should live primarily with Mother and her new husband and stepchildren.

W.C.B.'s maternal grandmother testified that she did not have a relationship with Mother or the child while Mother and Father were married but that she did by the time of trial; she did not think she would ever get to see W.C.B. during Father's possession if he were the parent who could choose W.C.B.'s primary residence.

One of Mother's colleagues testified that when she had observed W.C.B. with his parents while they were still married, Mother paid more attention to W.C.B. and tended to his needs more.

The wife of one of Father's best friends testified that Mother was the sole caregiver for W.C.B. during the marriage. She also testified that she had seen Father drink too much around W.C.B. but that she had never seen him do anything around W.C.B. that concerned her. She had not seen Father drinking since the divorce. She further testified that Father "can be a good father" and loves his son very much; she thought that he and Mother were both stable.

Mother testified that Father was very controlling in their relationship; she thought he was using W.C.B. as a pawn in their relationship.

**Father's Evidence**

Father's expert testified that he had observed Father during sessions for a couple of years and had spoken with him regarding fatherhood and parenting a small child. According to the expert, Father is very concerned about being the best father he can be, and he is an exceptionally compassionate young man. He was bonded with his son, had a good approach to parenting, and had "skills

9

beyond his age" regarding parenting. He said that Father had mentioned alcohol use, but it did not seem to be a great issue. He further testified that stability was particularly important for a child around the age of three.

Father testified that he wanted primary custody of W.C.B. because he had been married only one time and lived in the same house he was living in when W.C.B. was born; W.C.B. would also be going to the same daycare that he started in when he was seven weeks old. Father testified that W.C.B. had a routine at his home, that they rode a horse and tractor together, and that he had prepared a garden for them to work in. They also fished together and visited family.

Father was surprised to find out that Mother had moved in with someone two weeks after the divorce; he was not angry but he was a little scared for W.C.B. Father admitted that he probably mishandled his reaction when Mother came to the door to try to see W.C.B. during his possessory period. He admitted taking W.C.B. on a horse, tractor, and around the front driveway on a motorcycle, but he said the child was not in danger; W.C.B. had ridden with an adult on the same, gentle horse since he was a small baby. Father also said that he had never taken W.C.B. on the motorcycle while driving on the highway. Father testified that he was not dating anyone at the time of trial. He admitted that counseling had helped him and that he had changed some of his past behaviors. W.C.B. saw his paternal grandmother at least four times a week.

Father testified that he "used to drink a lot" but that he had stopped completely for four months; since that time, he had started drinking alcohol again, but only on occasion. Father admitted that he drank beer with his friend Nathan when he came to Father's house.

Father admitted dipping snuff in front of W.C.B. He testified that he would not allow W.C.B. to dip snuff until he was at least eighteen; he said at that time he would allow W.C.B. to make his own choice about it, but he did not see dipping snuff as a problem. Father testified that he would not continue to let W.C.B. ride on his motorcycle, but he would continue to let him ride a horse without a helmet.

Father admitted probably telling Mother he would divorce her if she took W.C.B. around her mother, but he said Mother chose not to have a relationship with her mother. Father also said that he thought Mother's mother was "a little crazy." Father thinks Mother is unstable; he testified that they had a good relationship until "it fell apart and she jumped right into another marriage."

Father admitted that his mother had pending criminal charges against her for allegedly misappropriating over $600,000.

Father's sister testified that W.C.B. attends the same daycare in Wichita Falls as her son, his cousin, and that they would play together "any opportunity they get." She said that Father changed a lot during fall 2009; although he used to drink to excess, it had been a year and a half since she had seen him drink beer.

11

Father's sister thought Mother was easily influenced by people that she is around. She had known Mother since she was thirteen or fourteen; Mother's mother was "absent through [Mother's] high school years," and Father's mother "filled the void." According to Father's sister, Mother and Father mutually decided that W.C.B. should not have a relationship with his maternal grandmother.

Father's mother testified that he had changed a lot for the better. She also testified that Mother decided not to have her own mother at her wedding to Father. Father's mother had been close to Mother because she "was hungry for a mother."

Father's brother-in-law testified that W.C.B. has a close relationship with his son and that "they're always together." He said that he is very safety-conscious and that he trusted both Mother and Father with his own son, who had also ridden a horse without a helmet. Father's brother-in-law thought W.C.B. would have more stability with Father.

Father's father agreed that in the past he had told Mother to tell Father not to drink so much, "when he was drinking."

**Analysis**

Based on the above evidence, the trial court found (1) that Mother and Father "both admitted to drinking alcoholic beverages, but drinking alcohol does not seem to have affected or hampered either party's ability to parent their son . . . , nor does it make either party unfit to parent the child," (2) that while dipping snuff is a "disgusting habit, . . . it does not necessarily make a person unfit to parent a child," and (3) that there is a lack of credible proof that Father's

allowing W.C.B. to ride horses and the four-wheeler constituted a danger to him. The trial court's findings show that it believed testimony regarding the changes Father had made in his life and Father's ability to parent W.C.B.

The trial court here had a difficult choice between two fit parents who both love their child. The trial court's findings explain that it chose the parent who lived in the county where the child had been born and had established ties, where the majority of the child's extended family, both maternal and paternal, lived, and where the child had been attending daycare with his cousin for some time. *See, e.g., In re R.T.H.*, 175 S.W.3d 519, 522 (Tex. App.—Fort Worth 2005, no pet.); *In re J.E.P.*, 49 S.W.3d 380, 387 (Tex. App.—Fort Worth 2000, no pet.) ("In determining whether a modification of possession and access is in the best interest of a child, the court may consider the age, developmental status, circumstances, and needs of the child, the circumstances of the managing and possessory conservators, and *any other relevant factor*.").

We conclude and hold that the trial court's best interest finding is supported by factually sufficient evidence. We overrule Mother's second issue.

## Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DELIVERED:  April 19, 2012